USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/28/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.E. and C.E., Individually, and as Parents of D.E., a
minor under the age of 18 years,

                                   Plaintiffs,

       -against-

CHAPPAQUA CENTRAL SCHOOL DISTRICT,

                                   Defendant.

No. 14-cv-3295 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

   J.E. and C.E. (collectively, "Plaintiffs" or "the Parents"), individually and as parents of

disabled child D.E., bring suit under the Individuals with Disabilities Education Act (the

"IDEA"), 20 U.S.C. § 1400 *et seq.*,[1] against Defendant Chappaqua Central School District ("the

District"). Presently before the Court is Plaintiffs' motion for summary judgment. (ECF No.

41.) For the following reasons, Plaintiffs' motion for summary judgment is DENIED.

## BACKGROUND

### I.     Legal Framework

   "Congress enacted the IDEA 'to ensure that all children with disabilities have available to

them a free appropriate public education that emphasizes special education and related services

designed to meet their unique needs . . . [and] to ensure that the rights of children with

disabilities and parents of such children are protected.'" *S.W. v. New York Dep't of Educ.*, 92 F.

Supp. 3d 143, 148 (S.D.N.Y. 2015) (quoting 20 U.S.C. § 1400(d)(1)(A)-(B)). "The IDEA

provides that a child with a disability must receive a 'free appropriate public education'

---

[1] "The [Individuals with Disabilities Education Improvement Act] IDEIA represents the most recent reauthorization
of the Individuals with Disabilities Education Act ("IDEA"), which took effect in July 2005." *B.K. v. N.Y.C. Dep't
of Educ.*, 12 F. Supp. 3d 343, 349 (E.D.N.Y. 2014).

("FAPE"), 20 U.S.C. § 1400(d)(1)(A), which includes special education and related services provided at public expense, that meet the standards of the state educational agency and are provided in conformity with an Individualized Education Program ("IEP")." *M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08-cv-8051 (TPG), 2010 WL 3398256, at *1 (S.D.N.Y. Aug. 27, 2010) (citing 20 U.S.C. § 1401(9)). "The IEP must be developed annually, by a 'school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child.'" *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 423 (S.D.N.Y. 2010), *aff'd*, 487 F. App'x 619 (2d Cir. 2012) (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 1129, 122 (2d Cir. 1998) (citing 20 U.S.C. § 1401(a)(20)). An IEP is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006), *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007) (quoting *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)).

"A child with a disability receives a FAPE when the child's education program is tailored to meet the child's unique needs and is 'reasonably calculated to enable the child to receive educational benefits.'" *M.P.G. ex rel. J.P.*, 2010 WL 3398256, at *1 (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). An appropriate education does not necessarily translate to the form of education most desired by the parents of a disabled child; rather, a school district is required to provide the child with an IEP "that is likely to produce progress, not regression, and . . . afford the student with an opportunity greater than

mere trivial advancement." *Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotations and citation omitted).

  Under the IDEA, parents may challenge the education placement of their child, as well as the IEP, through a hearing before an Impartial Hearing Officer ("IHO"). *M.P.G. ex rel. J.P.*, 2010 WL 3398256, at *1. Either party may appeal the determination of the IHO to a State Review Officer ("SRO"), who conducts an independent review of the IHO's findings and decision. *Id*. Finally, either party may appeal the SRO's decision to a state court or federal district court. *Id*.

  "Parents who are dissatisfied with a school district's placement may also unilaterally place their child in a private school and then seek retroactive tuition reimbursement from the local school district." *Id*. at *2 (citing 20 USC § 1412(a)(10)(C)). In that instance, the board of education may be required to reimburse parents for the education program if "(1) the educational program recommended by the board of education was inadequate or inappropriate; (2) the program selected by the parent was appropriate, such that the private program meets the student's special education needs; and (3) the equities support the parent's claim." *Id*. This three-part analysis is known as the *Burlington/Carter* test. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 12, 114 S.Ct 361, 364–65, 126 L.Ed.2d 284 (1993).

II.     **Factual Background**[2]

     **A.  D.E.'s Educational History**

     The student, D.E., was born in 1999.  (Plaintiff's Rule 56.1 Statement of Uncontroverted

Fact ("Pls.' 56.1"), ECF No. 43, ¶ 13.)  D.E. was classified with Autism by the District's

Committee on Special Education ("CSE") during the 2004-2005 school year when D.E. was in

kindergarten.  (*Id.* ¶ 14.)  D.E.'s classification and disability status remained the same from the

2004-2005 school year through the 2012-2013 school year.  (*Id.* ¶ 15.)  The

Neuro/Psychoeducational Evaluation prepared by Dr. Stephanie O'Leary and Dr. Toni Tarnell

notes that D.E. also has been diagnosed with Attention-Deficit/Hyperactivity Disorder.  (D-45 at

1.)  According to Dr. O'Leary, D.E.'s Autism "interferes with [his] ability to engage in language-

based tasks" as well as "socialization."  (T:2591.)  Additionally, Dr. O'Leary testified that D.E.'s

"diagnosis of ADHD and executive dysfunction also impacted his ability to engage with the

learning environment because he exhibited significant symptoms of inattention, inflexibility,

poor impulse control, difficulties initiating tasks . . . [and] struggles with planning, organization

and self monitoring."  (*Id.* at 2592.)

     When D.E. transitioned from elementary school to the *Seven Bridges Middle School*

("Seven Bridges"), CSE convened a meeting on May 22, 2009 to discuss the transition.

(T:1748.)  The Parents attended the meeting, along with various teachers and psychologists.  (D-

11 at 6.)  During the meeting, CSE recommended that D.E. be placed with a 2:1 teaching

---

[2] The Court has reviewed the administrative record provided by the parties.  For ease of reference, the Court adopts the same abbreviations utilized by the parties in their motion papers for references to the record herein. Accordingly, "P-___" refers to Plaintiffs' exhibits; "D-___" refers to the District's Exhibits; "T:___" refers to page references in the transcript of the hearing before the IHO; "FFD-___" refers to page references in the IHO's Findings of Fact and Decision; and "SRO-___" refers to page references in the SRO's Decision.

assistant rather than a 1:1 teaching assistant.[3]  (*Id*.)  D.E.'s mother later testified during the hearing before the IHO (the "Hearing") that she questioned that recommendation.  (T:1749–50.)

On December 4, 2009, a subcommittee of CSE convened to review the 2009-2010 IEP. (D-12 at 7.)  Comments from the December 2009 meeting indicate that D.E's transition to middle school "went well," but D.E.'s "previous functional behavior assessment is incompatible with the middle school setting."  (*Id*. at 8.)  Additionally, the comments portion of the 2009-2010 IEP notes that D.E.'s "social/emotional needs are preventing the student from producing measurable work on grade level in the classroom or on homework assignments."  (*Id*.)  The subcommittee recommended increased counseling.  (*Id*.) Subsequently, the 2:1 teaching assistant recommendation was monitored and a functional behavior assessment was completed.  (D-13 at 8; D-35.)  In February 2010, CSE modified its recommendation of a 2:1 teaching assistant and recommended D.E. receive a 1:1 teaching assistant.  (D-13 at 8.)

In April 2010, CSE provided D.E. with a Behavior Intervention Plan ("BIP").[4]  (D-36.) Additionally, CSE convened to draft D.E.'s 2010-2011 IEP.  (D-14.)  CSE recommended a 1:1 teaching assistant for the classroom setting and a 2:1 teaching assistant for lunch/recess.  (*Id*. at 2.)  During the Hearing, Ms. Shelley Langton, D.E.'s 6th grade special education teacher case manager,[5] testified that during the meeting for the 2010-2011 IEP, the Parents raised concerns about D.E. having different 1:1 teaching assistants due to his difficulty with transitions.  (T:439–40.)  She also noted that continuity was important to D.E.  (T:195.)  D.E.'s mother testified at the

---

[3] As the designations suggest, a 2:1 teaching assistant connotes two students assigned to one teaching assistant.  A 1:1 teaching assistant connotes one student assigned to one teaching assistant.

[4] A BIP sets forth strategies to address/reduce a student's problem behaviors.  *See E.Z.-L. ex rel. R.L. v. New York City Dep't of Educ.*, 763 F. Supp. 2d 584, 596 (S.D.N.Y. 2011), *aff'd sub nom. R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012).

[5] According to Ms. Langton, a case manager "is responsible for implementing the IEP and making sure that all the goals are being worked on, that all of the aspects of the IEP, the program accommodations and modifications are being met." (T:161.)

5

Hearing that she was "disappointed" at the start of the 2010-2011 school year because she had been promised the name of the 1:1 teaching assistant to get D.E. "comfortable" with the assistant, but she only found out who the teaching assistant was a couple of weeks before school. (T:1787.)  During the 2010-2011 school year, D.E. had several, different teaching assistants. (T:381.)

In March 2011, the District conducted an educational evaluation on D.E.  (T:166.)  Ms. Langton administered various tests to D.E. as part of D.E.'s three year reevaluation process as required by law for every child with an IEP.  (*Id.* at 167.)  D.E.'s reading, reading comprehension, writing, and spelling scores were average, whereas his pseudoword decoding score was below average.  (D-39.)  D.E.'s math scores were below average.  (*Id.*)  Despite D.E.'s average scores on the District's tests for reading, reading comprehension, writing, and spelling, D.E. received a below standard score on the English portion of the New York State Assessment. (P-C.)

At various points throughout the 2010-2011 school year, the Parents expressed concerns about D.E.'s functioning at Seven Bridges.  (P-II at 1.)  In particular, the Parents were concerned about D.E.'s "productivity and overall behavior."  (*Id.* at 2.)  The Parents also were concerned about D.E.'s social wellbeing based upon certain stories or poems written by D.E (T:1894–95) and due to the fact that D.E. increasingly suffered from meltdowns.  (T:4337.)  Finally, the Parents expressed their desire to have D.E.'s BIP updated.  (*Id.*)  In April 2011, a new BIP was developed, which replaced the 2010 BIP.  (D-36.)

### B. 2011-2012 IEP

On June 10, 2011, CSE convened to develop D.E.'s IEP for the 2011-2012 academic

year. (D-16.) The Parents attended the meeting. (*Id*.) CSE made the following

recommendations:

- direct consultant teacher services four times in a four-day cycle for science/social studies; two times in a four-day cycle in English language arts ("ELA"); two times in a four-day cycle in math; and indirect consultant teacher services once in a four-day cycle;

- a 1:1 teaching assistant in ELA, math, science, social studies, lunch, technology, and home and careers classes and a 2:1 teaching assistant for gym, orchestra, and art classes;

- biweekly group counseling services for D.E.;

- twice weekly speech-language therapy;

- twice monthly parent counseling at Seven Bridges and twice monthly parent counseling at home or in the community;

- implementation of the June 2011 BIP; and

- various summer services. (SRO-3.)[6]

A summary of the comments from the June 2011 CSE meeting notes that the Parents agreed with

CSE's recommendations. (D-16.) Nevertheless, on August 22, 2011, the Parents sent a letter to

the District rejecting the IEP as inappropriate; notifying the District that they had placed D.E. at

the Eagle Hill School[7] ("Eagle Hill"); and demanding tuition reimbursement for the 2011-2012

academic year. (P-D.) D.E. attended Eagle Hill for the 2011-2012 academic year. (D-47.)

---

[6] "The SRO's findings of fact are generally due appropriate deference by this Court, which is not an expert on education or childhood learning disabilities." *S.A. ex rel. M.A.K. v. New York City Dep't of Educ.*, No 12-cv-435 (RMM) (MDG), 2014 WL 1311761, at *1 (E.D.N.Y. Mar. 30, 2014) (citing *W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006)). Accordingly, the Court accords due deference to the SRO's well-support factual findings and adopts those findings herein. *See T.L. ex rel. B.L. v. Dep't of Educ. of City of New York*, No. 10-cv-3125 (SLT) (JB), 2012 WL 1107652, at *1, n.1 (E.D.N.Y. Mar. 30, 2012).

[7] Though Eagle Hill is not on New York's list of approved special education schools for New York residents, that is not an automatic bar to reimbursement. *See E.S. ex rel. B.S.*, 742 F. Supp. 2d at 443.

### C.  2012-2013 IEP

CSE convened on May 22, 2012 to discuss D.E.'s IEP for the 2012-2013 school year. (D-17.)  The Parents attended that meeting and "expressed concerns about the staff's ability to address their son's management and learning needs within Seven Bridges."  (*Id.*)  Subsequently, on July 25, 2012, the Parents filed a due process complaint notice alleging the District failed to provide D.E. with a FAPE.  (D-1.)  On August 17, 2012, CSE reconvened to respond to issues raised in the Parents' due process complaint.  (D-19.)  CSE made the following recommendations for D.E.'s 2012-2013 IEP:

- Direct and indirect consultant teacher services, three times in a six-day cycle, for science, math, ELA, and social studies;

- 12:1 special class four times in a six-day cycle;

- 1:1 teaching assistant;

- individual and group speech language therapy sessions;

- 2:1 reading instruction;

- individual and group counseling sessions;

- twice weekly behavioral intervention consultations from September – November 2012 and weekly behavioral intervention consultations until December 1, 2012; and

- initial use of the April 2011 BIP, which was to be updated if and when D.E. return to Seven Bridges in the fall of 2012.  (SRO-4.)

At the close of the August 2012 meeting, the Parents informed the District that they were rejecting the IEP and informed the District that they intended to seek tuition reimbursement for D.E.'s placement at Eagle Hill.  (*Id.*)  D.E. attended Eagle Hill for the 2012-2013 school year. (*Id.*)

**III.     Due Process Complaint**

As stated above, on July 25, 2012, Plaintiffs filed an Impartial Hearing Demand ("IHD") with the District.  (Pls.' 56.1 ¶ 1.)  Plaintiffs subsequently filed an amended IHD on September 13, 2012.  (*Id.*)  The amended IHD sought an order finding that the 2010-2011 IEP was inappropriate as written and applied; the 2011-2012 and 2012-2013 IEPs were inappropriate as written; and the District failed to conduct appropriate functional behavioral assessments[8] and implement appropriate BIPs during the 2010-2011, 2011-2012, and 2012-2013 school years.  (D-3 at 20–21.)  Plaintiffs also sought reimbursement for D.E.'s attendance at Eagle Hill for the 2011-2012 school year.  (*Id.* at 21.)  The District answered the July 2012 hearing demand on August 17, 2012 and the amended hearing demand on September 25, 2012.  (Pls.' 56.1 ¶ 2.)

On October 5, 2012, during a prehearing conference, the District made an application to dismiss Plaintiffs' claims relating to the 2009-2010 and 2010-2011 school years as either time-barred by the 2 year statute of limitations and/or moot because Plaintiffs were only seeking declaratory relief.  (*Id.* ¶ 3.)  Plaintiffs opposed the motion, clarified that they did not seek relief for the 2009-2010 school year, and withdrew their request for declaratory relief for the 2010-2011 school year.  (*Id.* ¶ 5.)  The IHO, Arthur J. Venezia, Ed.D., concluded in an interim decision dated November 3, 2012 that (1) claims for the 2009-2010 and 2010-2011 school years were time-barred; (2) claims for the 2009-2010 and 2010-2011 school years were moot because the Parents sought solely declaratory relief; (3) the District conceded the Parents properly challenged the April 2011 BIP and underlying functional behavioral assessment for the 2011-2012 and 2012-2013 school years; (4) the District conceded the Parents properly challenged the goals in the 2011-2012 and 2012-2013 IEPs; and (5) the Parents were permitted to introduce

---

[8] *See* Footnote 14 *infra* for a detailed explanation of a functional behavioral assessment ("FBA").

evidence of facts prior to the 2011-2012 school year directly related to claims for the 2011-2012 and 2012-2013 school years.  (*Id*. ¶ 6.)

### A.  Impartial Hearing Officer's Decision

Following a 21 day hearing, the IHO rendered his Findings of Fact and Decision ("FFD").  (Pls.' 56.1 ¶¶ 7–8.)  In the FFD, the IHO denied Plaintiffs' request for tuition reimbursement for the 2011-2012 and 2012-2013 school years; determined that Eagle Hill was not an appropriate placement for D.E. for the 2011-2012 and 2012-2013 school years; and determined that the equities did not favor the Parents.  (*Id*. ¶ 9.)

The FFD states that the Parents' "claims of years of complaints and years of watching their son fail to make progress is not borne out by the evidence and testimony."  (FFD-16.)[9] Rather, the comments portion to the 2011-2012 IEP notes that the Parents agreed with the recommendations, which the Parents admitted during the Hearing they did nothing to correct. (*Id*.)  Additionally, D.E.'s mother admitted that her biggest complaint regarding the IEP was whether the goals could be implemented properly.  (*Id*.)

The IHO found the District witnesses to be "uniformly impressive and credible."  (*Id*.) He also found the Parents' witnesses to be "impressive," but their testimony "was sometimes inconsistent and contradictory," particularly on cross-examination.  (*Id*. at 17.)

The IHO concluded that the FBAs/BIPs proposed by the District were appropriate.  (*Id*. at 22.)  He credited the testimony of Dr. Colleen O'Sullivan, the district consultant psychologist who drafted D.E.'s 2011 BIP, noting that "she has a vast background in autism" and "knew the student intimately."  (*Id*.)  Further, the Parents' witnesses did not seriously challenge the 2011 BIP.  (*Id*.)

---

[9] The version of the FFD provided to the Court did not contain page numbers.  For ease of reference, the Court assigns page numbers to the FFD, excluding the cover page and beginning with 1.

The IHO also rejected the Parents' argument that the behavioral strategies outlined in the 2011-2012 and 2012-2013 IEPs would not have been implemented appropriately, concluding that such argument was impermissibly speculative. (*Id*.)  The IHO made a similar conclusion with respect to the Parents' challenges to the goals in the IEPs. (*Id*. at 20.)

**B.  State Review Officer's Decision**

Plaintiffs appealed the IHO's ruling on the tuition reimbursement to the SRO. (Pls.' 56.1 ¶ 10.)  The SRO upheld the IHO's decision that the District offered D.E. a FAPE in the 2011-2012 and 2012-2013 school years but did not address whether the Parents' unilateral placement of D.E. at Eagle Hill was appropriate or whether the equitable considerations supported Plaintiffs' claim.[10]  (*Id*. ¶ 12.)

As an initial matter, the SRO concluded that the IHO did not exhibit bias or impartiality in conducting the Hearing. (SRO-17.)  First, the IHO's previous employment as a superintendent "does not by itself call into question his ability to render a fair and impartial hearing on the facts presented . . . ." (*Id*. at 18.)  Moreover, the IHO's experience as a superintendent gave him experience working with students with disabilities, which made him "sensitive to the claims raised by the parents in this case." (*Id*.)  Second, the SRO concluded that the Parents' claim that the IHO was incompetent was belied by the Hearing record. (*Id*. at 19.) Third, the Parents' claim that the IHO was observed sleeping during the Hearing was not credited, as the IHO explained that a recent surgery caused him to rub his eyes frequently. (*Id*.)

With respect to the 2011-2012 IEP, the SRO found that CSE recommended a program reasonably calculated to provide D.E. with educational benefits. (*Id*. at 21.)  The IEP "reflected that the student's cognitive profile was within the average range of functioning"; "reflected the

---

[10] The SRO stated that he need not reach the additional questions regarding the student's unilateral placement at Eagle Hill or equitable considerations, but also noted that "the weight of the evidence provides no reason to depart from the IHO's determinations on these issues."  (SRO-33 at n.35.)

student's greatest area of need was in mathematics where he required a modified curriculum and the assistance of a teaching assistant"; and "reflected that the student exhibited avoidant behaviors, a low frustration level, that he was easily overwhelmed by too much visual or auditory stimuli, and that he demonstrated poor mental stamina, a rigid approach to learning, and weaknesses in processing speed, integrating multiple ideas, and variable attention." (*Id*.)

The SRO also concluded that the goals outlined in the 2011-2012 IEP were appropriate. (*Id*. at 22.) With respect to the Parents' argument that the goals were strategies rather than true goals, the SRO found that "several of the goals appropriately reflected that the student would use a specific strategy in order to assist him in completing a particular task or skill." (*Id*.) The SRO also found that the goals "actually targeted the student's ability to use a specific strategy in order to complete a specific task . . . ." (*Id*.) The SRO also determined the Parents' argument that the goals lacked baseline levels to be meritless as New York state regulations do not require baselines. (*Id*. at 23.)

As to the appropriateness of using the April 2011 BIP for the 2011-2012 IEP, the SRO noted that the "April 2011 BIP was initially written and implemented during the last few months of the 2010-2011 school year and that it continued to be appropriate to meet the student's behavioral needs." (*Id*.) Further, the District's failure to generate a separate FBA was not error since the BIP incorporated information typically found in an FBA. (*Id*. at 23–27.)

With respect to the 2012-2013 IEP, the SRO similarly concluded that CSE recommended a program reasonably calculated to provide D.E. with educational benefits. (*Id*. at 27.) The SRO noted that CSE relied on current evaluative data, as well as information from the Parents, in generating the IEP. (*Id*.) Additionally, the SRO also found that the goals "comported with State regulations, were directly linked to the student's needs, and contained sufficient specificity by

which to guide instructions and intervention, evaluate the student's progress, and gauge the need for continuation or revision." (*Id.*) Further, CSE consulted with Eagle Hill staff in devising the goals. (*Id.* at 27–28.) Finally, the SRO found that "each goal in the August 2012 IEP clearly identified the specific skill the student was to achieve, the criteria by which the student's success toward achieving the skill was to be measured [], the procedures that would be utilized to evaluate the student's success, and how frequently the student's progress toward meeting each goal would be measured." (*Id.* at 28.)

As for the use of the April 2011 BIP for the 2012-2013 IEP, the SRO found that because "the student continued to exhibit deficits in social-emotional skills" similar to deficits he exhibited in past years, the April 2011 BIP remained appropriate. (*Id.*) Moreover, it was expressly stated that the April 2011 BIP would be updated upon D.E.'s return to Seven Bridges after the collection of additional data and increased behavior consult services. (*Id.* at 30.)

The SRO also agreed with the IHO's assessment that any challenges to the implementation of the 2011-2012 or 2012-2013 IEPs were "speculative as a matter of law." (*Id.* at 31.)

## IV.    Procedural History

Plaintiffs initiated the instant action on May 7, 2014. (ECF No. 1.) The Complaint asks that this Court set aside the decisions of the IHO and SRO and grant Plaintiffs' claim for tuition reimbursement for the 2011-2012 and 2012-2013 school years, as well as additional relief. (Compl. at 43–44.) On December 10, 2014, the District moved for judgment on the pleadings on the basis that Plaintiffs had failed to exhaust their administrative remedies under the IDEA. (ECF No. 15.) This Court issued an Opinion & Order on August 17, 2015 denying the District's

motion.  (ECF No. 35.)[11]  Subsequently, on January 15, 2016, Plaintiffs moved for summary

judgment.  (ECF No. 41.)

## DISCUSSION

**I.      Standard of Review**

"In an IDEA case, summary judgment 'triggers more than an inquiry into possible

disputed issues of fact.  Rather, the motion services as a pragmatic procedural mechanism for

reviewing' an administrative determination."  *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 434 (quoting

*Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation

omitted)).

"In considering the instant summary judgment motion[], the court is called upon to

conduct an independent review of the administrative record, along with any additional evidence

submitted by the parties—of which there is none—and to determine by a preponderance of the

evidence whether the IDEIA's strictures have been satisfied."  *B.K.*, 12 F. Supp. 3d at 355.

"While the district court must base its decision on the preponderance of evidence, it 'must give

due weight' to the administrative proceedings, 'mindful that the judiciary generally lack[s] the

specialized knowledge and experience necessary to resolve difficult questions of educational

policy.'"  *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 434 (quoting *Gagliardo v. Arlington Cent. Sch.

Dist.*, 489 F.3d 105, 113 (2d Cir. 2007)).  "Accordingly, 'district courts may not substitute their

own notions of sound educational policy for those of the school authorities which they review.'"

*E.S. ex rel. B.S.*, 742 F. Supp. 2d at 434 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165,

171 (2d Cir. 2009) (internal quotation omitted)).

---

[11] In the August 17, 2015 Opinion & Order, this Court also dismissed the New York State Education Department as a defendant in the action.

"At the same time, judicial review in IDEA cases must not be a mere 'rubber stamp' for the decisions of state administrators." *F.L. v. New York City Dep't of Educ.*, No. 15-cv-520 (KBF), 2016 WL 3211969, at *7 (S.D.N.Y. June 8, 2016) (quoting *Walczak*, 142 F.3d at 129). "Where an SRO's conclusion is 'against the weight of the evidence and thus flawed, deference is not warranted.'" *Id.* (quoting *R.E.*, 694 F.3d at 194). "In addition, courts do not defer to state officers with respect to issues of law, such as the proper interpretation of federal statutes." *Id.* (quoting *Lillbask ex rel. Mauclaire*, 397 F.3d at 82).

## II.   IHO Bias

As an initial matter, the Court addresses Plaintiffs' argument that the IHO should not be afforded deference due to his bias and alleged incompetence to serve. *See E.S. ex rel. B.S.*, 742 F. Supp. 2d at 434. Plaintiff specifically asserts that the IHO was biased given his background as a former New York superintendent of schools and that he was "incompetent to serve" because he was not a licensed attorney and was observed to be "nodding off" during certain portions of the Hearing. Section 200.1(x) of the Compilation of Codes, Rules and Regulations of the State of New York ("NYCCRR") sets forth the definition and prerequisites of the IHO position.

With respect to Plaintiffs' bias argument, on the eighth day of the Hearing prior to the commencement of Plaintiffs' case-in-chief, Plaintiffs' counsel requested that the IHO recuse himself after the IHO revealed off-the-record that he had served previously as a superintendent in New York schools for 20 years. (*See* T:1355–1362.) Counsel for the District opposed the application. (*Id.* at 1355–1357.) The IHO denied Plaintiffs' application, noting that he has served as an IHO and met the standards of the position since 1985. (*Id.* at 1358–1361.) He addressed the issue again on another day in the Hearing, providing the parties with a full explanation of his background as a superintendent, as well as a copy of his resume. (*Id.* at 1638–

1647.)  NYCCRR § 200.1(x) states that "[n]o individual employed by a school district, school or program serving students with disabilities placed there by a school district committee on special education may serve as an impartial hearing officer and no individual employed by such schools or programs may serve as an impartial hearing officer for two years following the termination of such employment."  N.Y. Comp. Codes R. & Regs. § 200.1.  Accordingly, the IHO's previous employment as a superintendent of New York schools does not automatically disqualify him from serving in the IHO role.  Furthermore, there is nothing in the record to suggest that the IHO had served as a superintendent within two years of the Hearing.  The record reflects that the IHO sustained and overruled objections raised by both sides, even reconsidering his rulings on certain objections; accommodated scheduling issues with respect to witnesses for both parties; and asked questions of witnesses from both parties.  The IHO's "actions do not show a bias or lack of impartiality . . . ." *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 435.[12]

With respect to Plaintiffs' competency challenge, NYCCRR § 200.1(x)(1) states that an IHO must "be an individual admitted to the practice of law in the State of New York who is currently in good standing . . . *or* be an individual certified by the State of New York as an impartial hearing officer on September 1, 2001."  N.Y. Comp. Codes R. & Regs. § 200.1 (emphasis added).  Plaintiffs present the Court with no evidence substantiate their conclusory statement that the IHO is not admitted to practice law in New York.  In any event, even if the IHO is not an attorney admitted in New York, pursuant to the statute, he may still serve as an IHO if he is certified.  During the Hearing, the IHO acknowledged that he is on the New York State Education Department's list of approved hearing officers and has "met all of the state['s] exacting standards."  (T:1644.)

---

[12] The Hearing transcript also reflects that the IHO never served as a superintendent in the Chappaqua school district.  (T:1639, 1642.)

Finally, Plaintiffs' argument that the IHO was incompetent to serve because he was sleeping during certain portions of the Hearing is unsupported by the record. Plaintiffs point to no portion of the Hearing during which the IHO was unable to issue a ruling because he was sleeping. Additionally, the IHO explained that, to the extent the parties observed him rubbing his eyes, it was due to irritation from a recent eye surgery. (T:1637–38.) The record reflects that the IHO was engaged during the Hearing, able to rule on objections in a timely fashion, and conducted the Hearing in an impartial manner. Therefore, the Court affords the IHO's decision the appropriate level of deference in its review.

**III.   Entitlement to Tuition Reimbursement**

As stated above, under the *Burlington/Carter* test, "[t]he Court may require the school district reimburse parents for their expenditures for private school educational services obtained for a student by the parents, if (1) the services offered by the district were inappropriate, (2) the services selected by the parent were appropriate, and (3) equitable considerations support the parent's claim." *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 443.

Prong one of the *Burlington/Carter* test involves both a procedural and substantive inquiry: "(1) whether the student's IEP was developed according to the IDEA's procedural requirements, and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer educational benefit on the student." *M.P.G. ex rel. J.P.*, 2010 WL 3398256, at *2 (citing *Walczak*, 142 F.3d at 129); *see P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 105 (E.D.N.Y. 2011), *aff'd, appeal dismissed*, 526 F. App'x 135 (2d Cir. 2013) ("A procedural violation generally concerns the process by which the IEP and placement offer was developed and conveyed; on the other hand, a substantive violation arises from a deficiency in the programming being offered.") "Under the IDEA, if a procedural violation is

alleged, an administrative officer may find that a student did not receive a FAPE *only if* the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits." *M.P.G. ex rel. J.P.*, 2010 WL 3398256, at *2 (citing 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2)) (emphasis added). In the event a court determines that the services offered by the school district were appropriate under the first prong of the *Burlington/Carter* test, it need not reach the second prong (appropriateness of parents' placement) and the third prong (equities). *See Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir. 2000).

On appeal, Plaintiffs raise both procedural and substantive challenges to D.E.'s IEPs for the 2011-2012 and 2012-2013 school years.[13] As Plaintiffs initiated review of the SRO's decision, they bear the burden of persuasion as to the inappropriateness of the 2011-2012 and 2012-2013 IEPs, as well as the appropriateness of D.E.'s placement at Eagle Hill. *See B.K.*, 12 F. Supp. 3d at 356–57 (citing *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (citing *Gagliardo,* 489 F.3d at 112)).

---

[13] Plaintiffs also raise arguments related to the 2010-2011 school year. (Pls.' Mot. at 7–9.) Plaintiffs contend that "[t]he evidence of [the District's] pattern and practice of depriving D.E. of a FAPE is relevant as it concerns the affect it had on Plaintiffs' placement decision for the 2011-2012 and 2012-2013 school year." (*Id.* at 7.) It appears then that the Parents are attempting to argue that the 2011-2012 and 2012-2013 IEPs were bound to be inadequate based upon the perceived, past failings of the District. However, that argument is impermissibly speculative. To the extent that Plaintiffs are attempting to renew challenges to the 2009-2010 and 2010-2011 school years, that is improper. As the SRO concluded, the Parents "expressly withdrew all of their claims as to the 2009-10 and 2010-11 school years at the beginning of the impartial hearing." (SRO-16.)

### A.  2011-2012 IEP

With respect to the 2011-2012 IEP, Plaintiffs contend that D.E. was denied a FAPE and the IDEA was violated because: (1) the District failed to consider the Parents' requests; (2) the District failed to conduct an FBA; and (3) the 2011-2012 IEP contained inappropriate goals.[14]

### i.     Failure to Consider the Parents' Requests

Plaintiffs first allege that the District failed to consider their request for an out-of-district placement, their input as to the appropriateness of the 2011-2012 IEP goals, and their request for a self-contained classroom.  These arguments amount to an allegation that the CSE predetermined D.E.'s 2011-2012 IEP, which allegedly impeded the Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to D.E.  The IHO concluded that the record demonstrated that the Parents were in agreement with the recommendations set forth in the 2011-2012 IEP.  In particular, the "comments" section of the 2011-2012 IEP notes that the Parents were in agreement with the recommendations and that it was not until the May 22, 2012 CSE meeting that the comments section reflected that the Parents no longer appeared to be in agreement.  (FFD-16.)  Furthermore, members of CSE who testified at the Hearing stated that the Parents were in agreement with the IEP's recommendations.  (*Id.*)  Finally, the IHO noted that the Parents admitted during the Hearing that they never contacted the District to correct the "comments" section of the IEP.  (*Id.*)  The IHO thus concluded that "the parents' claim of years of complaints and years of watching their son fail to make progress is not borne out by the evidence and testimony."  (*Id.*)  Additionally, the IHO noted that to the extent the Parents' opinions were not considered at CSE meetings, it was because the attorneys for the Parents, rather than the Parents themselves, "did much of the talking" at those meetings.  (*Id.* at

---

[14] In his decision, the SRO noted that the Parents abandoned the additional procedural challenge that the District failed to timely inform the Parents of the identity of D.E.'s teaching assistant for the 2011-2012 school year.  (SRO-6, n.11.)  The Court agrees and will not address that challenge herein.

25)  The IHO concluded that such conduct "raises serious questions as to whether the parents

attended the CSE meetings for either the 2011-12 or 2012-13 school years with the intent of

helping develop appropriate IEPs." (*Id*.)  The Court sees no basis to disturb the finding that the

Parents were afforded an opportunity to participate in creating D.E.'s IEP.

"Predetermination of a child's IEP amounts to a procedural violation of the IDEIA if it

deprives the student's parents of meaningful participation in the IEP process." *B.K.*, 12 F. Supp.

3d at 358 (collecting cases).  "The core of the statute is that the development of the IEP be a

cooperative process between the parents and the district, and predetermination by a district of a

child's IEP undermines the IDEA's fundamental goal to give parents a voice in the educational

upbringing of their children." *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F.

Supp. 2d 606, 648 (S.D.N.Y. 2011) (internal quotation and citation omitted).  Notably, "[c]ourts

have rejected predetermination claims where the parents actively and meaningfully participated

in the development of the IEP." *Id*.  (collecting cases).

The record reflects that the Parents were in attendance at the June 10, 2011 CSE meeting

to discuss D.E.'s 2011-2012 IEP.  (D-16 at 1.)  Additionally, the comments section of the IEP

notes that the Parents expressed agreement with the recommendations made at the meeting.  (*Id*.

at 2.)  During the Hearing, Ms. Langton testified that at the June 2011 meeting there was a

discussion among the participants, including the Parents, regarding certain goals set forth in the

IEP.  (T:243.)  She testified that she did not recall the Parents objecting to the goals set forth in

the IEP.  (*Id*. at 244.)  Ms. Langton also testified that in response to the Parents' concern that the

quarterly meetings to discuss the IEP were insufficient during D.E.'s sixth grade year, monthly

meetings were added to discuss the IEP's goals and D.E.'s behavioral needs.  (*Id*. at 256–58.)

Accordingly, the record reflects that the Parents were actively engaged in the formulation of the

2011-2012 IEP.  The mere fact that the IEP may not have incorporated every request from the Parents "does not render the Parents 'passive observers' or evidence any predetermination on the part of the CSE."  *B.K.*, 12 F. Supp. 3d at 359 (citing *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F.Supp.2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were 'pre-determined.'  A professional disagreement is not an IDEA violation.")).  Therefore, the Court agrees that the record does not reflect a procedural violation with respect to the involvement of the Parents in the development of the 2011-2012 IEP.

### ii.   Failure to Conduct FBA

Plaintiffs' other procedural challenge concerns the District's alleged failure to conduct a FBA.[15]  "Under New York law, the CSE must conduct a FBA 'for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities.'"  *P.K. ex rel. S.K.*, 819 F. Supp. 2d at 106 (quoting 8 N.Y. Comp. Codes R. & Regs. § 200.4(b)(1)(v)).

---

[15] New York State regulations define a FBA as the "process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment."  N.Y. Comp. Codes R. & Regs. § 200.1(r).  The statute further dictates that the FBA "shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it."  *Id*.  Additionally, the FBA should "be based on multiple sources of data including, but not limited to, information obtained from direct observation of the student, information from the student, the student's teacher(s) and/or related service provider(s), a review of available data and information from the student's record and other sources including any relevant information provided by the student's parent. The FBA shall not be based solely on the student's history of presenting problem behaviors."  *Id*. at § 200.22(a)(2).  Finally, "[t]he FBA shall provide a baseline of the student's problem behaviors with regard to frequency, duration, intensity and/or latency across activities, settings, people and times of the day and include the information required in section 200.1(r) of this Part in sufficient detail to form the basis for a behavioral intervention plan for the student that addresses antecedent behaviors, reinforcing consequences of the behavior, recommendations for teaching alternative skills or behaviors and an assessment of student preferences for reinforcement."  *Id*. at § 200.22(a)(3).

"However, a FBA is not explicitly required under the IDEA; the IDEA mandates simply that the CSE 'consider the use of positive behavioral interventions and supports, and other strategies,' to address a student's behavior that 'impedes the child's learning or that of others.'" *P.K. ex rel. S.K.*, 819 F. Supp. 2d at 106 (quoting 20 U.S.C. § 1414(d)(3)(B)(i)). Therefore, the absence of a FBA does not render an IEP *per se* legally inadequate. *See A.C. ex rel. M.C.*, 553 F.3d at 172. Additionally, where, as here, "the IEP actually included a BIP, parents should at least suggest how the lack of an FBA resulted in the BIP's inadequacy or prevented meaningful decision making." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013).[16]

Though the Parents argue there was no FBA in place for the 2011-2012 school year, the SRO concluded that the District's failure to generate a separate, written FBA for the 2011-2012 school year did not amount to a procedural violation because "the April 2011 BIP reveals that . . . it included information that would typically be found in an FBA." (SRO-23.)  Further, the SRO concluded that the 2011 BIP "adequately and appropriately addressed [D.E.'s] behavioral needs in accordance with State regulations for the 2011-12 school year." (SRO-27.)  Based upon an independent review of the record, the Court agrees with this assessment.

As noted by the IHO and SRO, Dr. Colleen O'Sullivan, the district consultant psychologist who drafted D.E.'s 2011 BIP, testified at the Hearing that she conducted a FBA on D.E., which was incorporated into the 2011 BIP, rather than memorialized in a separate, written document. (T:1184–85.)  Dr. Sullivan testified that in preparing the 2011 BIP, she worked with Ms. Langton; Dr. Sherry Schur, the school psychologist at Seven Bridges; and D.E.'s teaching assistant. (T:1173.)  She further testified that she relied upon her "observations and historical

---

[16] By way of example, the Second Circuit noted that "parents could argue that an FBA would have exposed a BIP's obsolete assessment of the student's behavioral problems or that the recommended behavior-modification strategies failed to accommodate the frequency or intensity of the student's behavioral problems." *M.W. ex rel. S.W.*, 725 F.3d at 140.

knowledge" of D.E.; "conversations with his teaching assistants, conversations with various

leave replacements in addition to Miss Langton, and certainly conversations" with D.E.'s mother

in generating the 2011 BIP.  (T:1174.)  Dr. O'Sullivan also factored the following documents

into the FBA:

- an incentive chart that was used with D.E. (T:1176–77; P-N);

- a "scatter plot form" created by Dr. O'Sullivan for school staff "to gather baseline information regarding the frequency of D's refusals" (T:1178–79; P-Q);

- an A-B-C form created by Ms. Langton "for purposes of gather additional information regarding [D.E.'s] behaviors," which provided Dr. O'Sullivan with additional detail regarding D.E.'s "refusal behavior" (T:1178–79; P-CC); and

- a document created by D.E.'s teaching assistant during the 2009-2010 school year reflecting "strategies and tools" that were "highly effective" during that school year to adopt for D.E.'s sixth grade year (T:1181–82; D-37).

For certain documents, Dr. O'Sullivan confirmed that this is the type of information she typically

considers in conducting FBAs.  (T:1178, 1181.)

The 2011 BIP identifies D.E.'s problem behavior—"[r]efusing to complete classroom

work or following requests" and "escalating agitation (meltdowns) and inappropriate statements

(name calling)"; identifies when such behavior occurs—when D.E. completes "[a]ssignments

involving written expression and group and/or partner work . . . [t]hat is, tasks in which he is

required to formulate and express his ideas, opinions, or experiences and collaborate with

classmates"; and provides a baseline of the problem behavior—4 to 5 episodes per week each

lasting anywhere from 6 minutes to up to 160 minutes and typically following a transition from

one teaching assistant to another, as observed during a two month period in 2011.  (D-40 at 1–2.)

The 2011 BIP discusses at length methods of preventing D.E.'s problem behavior, including

providing D.E. with a written schedule of activities, minimizing non-essential teacher requests

(i.e., requests for pencils or notebooks), differentiation of assignments in terms of length and

complexity, frequently reinforcing positive behavior with praise, and minimizing the number of transitions between teaching assistants during the day.  (D-40 at 3–5.)  Therefore, the Court finds that the 2011 BIP incorporated the type of information typically found in a FBA.

The Parents argue that even if the Court does not find the absence of a separate document reflecting the FBA to be a procedural error, the 2011 BIP is nevertheless insufficient because (i) it does not incorporate data from D.E.'s speech pathologist or D.E.'s student records and (ii) Dr. Fiorile testified that the 2011 BIP revealed a flawed FBA.  (Pls.' Mot. at 12–15.)  First, simply because the 2011 BIP does not incorporate all data potentially relevant to an assessment of D.E.'s problem behavior does not mean that the 2011 BIP is inadequate.  As the SRO concluded and this Court confirmed, the 2011 BIP appropriately incorporated multiple data sources, including feedback from D.E.'s own parents; identified D.E.'s target behavior and the frequency of such behavior; delineated antecedents to D.E.'s target behavior; hypothesized the reasons for D.E.'s problem behavior; and outlined a plan to address D.E.'s target behavior.  Second, Dr. Fiorile's assessment that the 2011 BIP was flawed in certain respects does not render it inadequate.  In her educational evaluation report, prepared a year after the 2011 BIP was prepared, Dr. Fiorile noted that behavioral data included in the 2011 BIP should have been presented in graphic format, the 2011 BIP did not accurately reflect the antecedents of D.E.'s problem behavior, and the 2011 BIP failed to indicate the manner in which staff would be trained to implement the plan.  (D-46 at 9.)  With respect to the graphic format, Dr. O'Sullivan testified that such a format would not depict the data in a "relevant or meaningful way" and that a written description better captured observations of D.E.'s behavior.  (T:1213.)  As for the antecedents, Dr. O'Sullivan clarified that transitions between teaching assistants were not antecedents but rather "setting events" that "serve to set the stage for a greater likelihood" of problem behavior.

(T:1215.)  Finally, with respect to the staff training, Dr. O'Sullivan testified that it was important but not something typically included in a BIP.  (T:1216.)  At bottom, the criticisms of the 2011 BIP advanced by Dr. Fiorile are either irrelevant or so minor as to not call into question the adequacy of the BIP.

In light of the fact that the Second Circuit has held that the complete failure to conduct an FBA does not necessarily result in the denial of a FAPE (*see J.C. v. New York City Dep't of Educ.*, No. 15-cv-1296, 2016 WL 1040160, at *2 (2d Cir. Mar. 16, 2016)) and the ample evidence in the record that the District conducted a comprehensive FBA, which was incorporated into the 2011 BIP, the absence of a separate, written FBA in the instant case is not a procedural violation rising to a denial of FAPE.

### iii.    IEP Goals

"The IDEA requires that a student's IEP include 'a statement of measurable annual goals, including academic and functional goals, designed to . . . enable the child to . . . make progress' and 'meet each of the child's other educational needs that result from the child's disability.'" *L.O. v. N.Y.C. Dep't of Educ.*, No. 15-1019, 2016 WL 2942301, at *15 (2d Cir. May 20, 2016) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa) & (bb)).  "In this Circuit, courts are 'reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.'" *J.L. v. City Sch. Dist. of City of New York*, No. 12-cv-1516 (CM), 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20, 2013) (quoting *P.K.*, 819 F. Supp. 2d at 109; *R.R. v. Scarsdale Union Free School District*, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009)).  This is because "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003).  Additionally, "deference is particularly apt where the

IHO and SRO decisions are in agreement and are based on the same record as that before the district court." *B.K.*, 12 F. Supp. 3d at 360.

Plaintiffs argue that the 2011-2012 IEP goals were inappropriate because (1) D.E. could not achieve the goals, (2) the goals were strategies rather than true goals, and (3) there were no baselines on which to review the goals.[17]  (Pls.' Mot. at 15–16.)  The 2011-2012 IEP delineated 36 goals.  (D-16 at 7–10.)    First, Plaintiffs' argument that D.E. could not achieve his goals is based solely on the Parents' subjective belief about D.E.'s capabilities.  The Parents' unilateral assessment of D.E.'s ability to meet the IEP's stated goals does not render the goals inappropriate.  Second, the SRO rejected Plaintiffs' argument that the IEP goals were strategies rather than goals.  (SRO-22.)  The SRO reasoned that "several of the goals appropriately reflected that the student would use a specific strategy in order to assist him in completely a particular task or skill."  (*Id*.)  The Court agrees.  The vast majority of the goals are goals in the traditional sense (i.e., write a 4 paragraph essay).  (D-16 at 7.)  To the extent the goals contain strategies, the strategies are not listed in lieu of goals; rather, certain goals also contain strategies to enable D.E. to achieve the goals.  For example, to assist D.E. in understanding U.S. currency (the goal), the IEP notes the D.E. should solve simple money problems (the strategy).  (*Id*. at 8.)  Third, as noted by the SRO, New York state regulations do not require IEP goals to contain baselines.  *See R.B. v. New York City Dep't of Educ.*, No. 12-cv-3763 (AJN), 2013 WL 5438605, at *13 (S.D.N.Y. Sept. 27, 2013), *aff'd*, 589 F. App'x 572 (2d Cir. 2014) (holding that "nothing in the state or federal statute requires that an IEP contain 'baseline levels of functioning' from which progress can be measured").  The Court also agrees with the SRO's assessment that "the

[17] These critiques appear to be based in large part on the testimony and opinion of Dr. Fiorile.  However, as noted by the IHO, Dr. Fiorile appeared to "shift her position" on the appropriateness of the goals during her cross-examination at the Hearing.  (FFD-17.)  This undercuts Plaintiffs' challenges to the goals in the 2011-2012 IEP.

absence of baseline functioning would have no effect on the ability to measure the student's progress towards meeting [the IEP] goals, as the criteria for mastery for these goals was not dependent on the student's baseline functioning but rather how often the student was able to perform the task using the specified strategy." (SRO-23.)[18]  Accordingly, the Court concludes that the SRO's determination that the goals "comported with State regulations, were sufficiently linked to the student's needs, and contained sufficient specificity by which to guide instruction and intervention, evaluate the student's progress, and gauge the need for continuation or revision" is supported by the record and is entitled to deference.

### B.  2012-2013 IEP

With respect to the 2012-2013 IEP, Plaintiffs contend that D.E. was denied a FAPE and the IDEA was violated because: (1) it was inappropriate for the District to use the 2011 BIP for the 2012-2013 school year, (2) CSE failed to consider the Parents' complaints regarding implementation of the goals and the six-day class cycle proposal,[19] and (3) the IHO and SRO failed to consider the opinions of the Parents' experts.

---

[18] Plaintiffs additionally argue, in conclusory fashion, that the goals were not written in operational terms and did not contain a method for measuring progress.  Though Plaintiffs' Statement of Undisputed Facts contains those assertions, they are not supported by the citations to the record.  Furthermore, based upon the Court's review of the goals in the 2011-2012 IEP, the Court does not agree with Plaintiffs that the goals were not operational or did not contain a sufficient method for measuring D.E.'s progress.

[19] The SRO's decision noted that the portion of the Parents' petition pertaining to the six-day class cycle cited to paragraphs in the amended due process complaint notice (D-3) that have nothing to do with the six-day class cycle.  (SRO-10 at n.14.)  Accordingly, the SRO determined that the amended due process notice "failed to raise any claims beyond those addressed by the IHO"; "the IHO did not err in limiting the parents' challenge to the June 2011 and August 2012 IEPs to the goals as written in those IEPs"; and he did not address the six-day class cycle in his decision.  (*Id.*)  The Court concurs that the amended due process notice does not raise a challenge to the six-day class cycle and accordingly does not address that complaint herein.  *See M.O. v. New York City Dep't of Educ.*, 996 F. Supp. 2d 269, 271 (S.D.N.Y. 2014) ("Plaintiffs argue that the IEP was inadequate due to a variety of defects, most of which were not specifically raised before the state hearing officers and thus are not appropriate for review at this stage." (citations omitted)); *A.M. ex rel. Y.N. v. N.Y. City Dep't of Educ.*, 964 F. Supp. 2d 270, 282–83 (S.D.N.Y. 2013) (holding that a failure to include a challenge to the appropriateness of a recommendation in a due process complaint normally precludes consideration of the claim by the IHO and SRO, as well as the court reviewing those decisions); *B.M. v. N.Y. City Dep't of Educ.*, No. 12-cv-3247 (JMF), 2013 WL 1972144, at *7 n.2 (S.D.N.Y. May 14, 2013) ("The fact that a court may consider new *evidence*, however, does not mean that it may consider a new *argument* or *claim*." (emphasis in original)), *aff'd*, 569 F. App'x 57 (2d Cir. 2014); *and B.P. v. N.Y.*

### i.     Use of the 2011 BIP

Plaintiffs argue that the SRO erred in concluding the use of the 2011 BIP for the 2012-2013 school year was appropriate.  During the Hearing, Dr. O'Sullivan testified that the 2011 BIP was not initially updated for the 2012-2013 school year because it remained appropriate until D.E. reentered public school, allowing for the collection of additional data to update the BIP.  (T:1228–1233.)  Additionally, she testified that the 2012-2013 IEP provided for a "weekly behavioral consultation" that was "intended to specifically evaluate the effectiveness of the behavior plan."  (*Id*. at 1232–33.)  Consistent with Dr. O'Sullivan's testimony, the 2012-2013 IEP calls for a bi-weekly meeting from September 5, 2012 to November 30, 2012 and a weekly meeting until December 1, 2012 for D.E.'s teacher to "provide teacher training and support regarding the development and implementation of the behavior intervention plan."  (D-19 at 20.)  Additionally, the 2012-2013 IEP includes a monthly meeting between D.E.'s teachers and a counselor to discuss D.E.'s "social emotional needs, progress, and ongoing development of the behavior intervention plan."  (*Id*. at 20–21.)  Additionally, Elizabeth Wright, the chairperson of CSE, testified during the Hearing that CSE intended to update the 2011 BIP with new baseline data upon D.E.'s reentry to public school.  (T:831.)  Ms. Wright further noted that based upon representations from Eagle Hill staff, the behavioral problems D.E. exhibited at Eagle Hill were similar to problems previously observed by the District, which warranted use of the 2011 BIP, at least for the start of the school year.  (*Id*. at 833–34.)  Given the District's acknowledgment that the 2011 BIP would need to be updated upon D.E.'s return to public school and the provision in the 2012-2013 IEP for monitoring the continuing applicability of the 2011 BIP, the Court

---

*City Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant.")

concludes that the use of the 2011 BIP did not deprive D.E. of education benefits or impede his right to a FAPE.

### ii.     The Parents' Complaints Regarding Implementation of the Goals and the 2011 BIP

While a procedural violation in drafting a student's IEP may rise to the denial of a FAPE if the violation significantly impedes the parents' opportunity to participate in the decision-making process, a school district is not required to revise an IEP to address every complaint raised by the student's parents or even provide the student with the form of education most desired by the student's parents.  The Second Circuit is clear that the IDEIA enables parents to provide "input," but does not bestow a "veto" power.  *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009); *see also M.T. v. New York City Dep't of Educ.*, No. 15-cv-5226 (RJS), 2016 WL 1072491, at *6 (S.D.N.Y. Feb. 26, 2016) ("The IDEA'S procedural requirements mandate only a parent's opportunity to participate, not that the parent have the final word.") (internal quotation and citation omitted).  With respect to the 2012-2013 IEP, Plaintiffs contend that CSE's failure to consider their complaints regarding the ability of the District to implement the IEP's goals and 2011 BIP is a procedural violation rising to the level of a denial of a FAPE.

In his decision, the SRO notes that the Parents' concerns regarding the IEP goals relate to the implementation of the goals.  (SRO-29 at n.28.)  The SRO concluded that the Parents' concern was "entirely speculative in nature" and did "not inform the appropriateness of . . . [the] August 2012 IEP[]."  (*Id.*)  However, the Parents assert that their challenge to the District's ability to implement the goals is not speculative because it is based upon the failings of Seven Bridges to implement the 2011 BIP in prior school years.  (Pls.' Mot. at 19.)  Plaintiffs point to

their testimony, the testimony of Ms. Langton, and the testimony of the District's psychologist in support of their argument that the District had failed to previously implement the 2011 BIP. During the Hearing, D.E.'s father testified that during a May 2012 meeting to discuss D.E.'s 2012-2013 IEP, he expressed that he had "zero confidence that [the District] [could] effect virtually any of these goals." (T:2585–86.) Such testimony is conclusory in nature and, standing alone, does not warrant the conclusion that the District was unable to implement the goals in the IEPs or the 2011 BIP. While Ms. Langton testified that "it was challenging to implement the plan consistently all the time given the pace of the public school . . . for the most part when [D.E.] knew what was happening and what was expected and it was limited and he felt he could accomplish it, it would be successful for him." (*Id*. at 207.) Ms. Langton further testified that the 2011 BIP "would be an effective plan" for D.E. (*Id*. at 208.) Accordingly, Ms. Langton's testimony does not support the Parents' argument. Finally, Dr. O'Sullivan's testimony that "isolated parts" of the 2011 BIP were implemented during the 2010-2011 school year does not establish that the District was unable to implement the goals or the 2011 BIP. Indeed, the 2011 BIP was not developed until the end of the 2010-2011 school year, so it is unsurprising that only portions of it were implemented. Ultimately, then, the Parents' argument hinges upon their personal misgivings about the District's capabilities. However, "mere '[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.'" *J.M. v. New York City Dep't of Educ.*, No. 15-cv-353 (VEC), 2016 WL 1092688, at *8 (S.D.N.Y. Mar. 21, 2016) (quoting *R.E.*, 694 F.3d at 195). *See also P.F. v. Bd. of Educ. of the Bedford Cent. Sch. Dist.*, No. 15-cv-507 (KBF), 2016 WL 1181712, at *10 (S.D.N.Y. Mar. 25, 2016) (holding that "it would be speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates") (internal

quotation and citation omitted).  Where, as here, the school district is capable of providing the services proscribed in the IEP or implementing the strategies or methodologies recommended in the IEP, it is speculative for parents to conclude that the school district cannot meet the IEP's goals.

### iii.    Expert Opinions

Finally, the Parents assert that the IHO and SRO erred in failing to consider the expert testimony and reports of Dr. Tarnell, Dr. O'Leary, and Dr. Fiorile, who all concluded that D.E.'s IEP was not sufficiently tailored to enable him to receive educational benefits.  (Pls.' Mot. at 18.)

In his opinion, the IHO noted that on cross-examination, Dr. Fiorile "seemed to shift her position on both the goals and the FBAs/BIPs.  When she was questioned about the appropriateness of specific items in the IEPs and the FBAs/BIPs, her initial strong criticism under direct examination became less certain under cross-examination . . . ."  (IHO-17.)  The IHO noted that Dr. Tarnell was "vague" and "[a]t times, it was not clear if [she] was testifying for the parents or the District."  (IHO-18.)  Dr. Tarnell testified that she believed the goals in the 2011 BIP were "appropriate" and that they may have to be "revised over time in conjunction with [D.E.'s] progress or emergent factors."  (*Id*.)  Furthermore, the SRO specifically considered Dr. Fiorile's critiques of the goals in the 2011-2012 IEP but concluded that they were without merit.  (SRO-22-23.)

The Court finds that the IHO and SRO did not err in their treatment of the opinions of the Parents' experts.  As an initial matter, the record reveals that the Parents' experts did not altogether reject the IEPs.  Second, even to the extent the Parents' experts disagreed with the IEPs, the "'mere fact that a separately hired expert has recommended different programming does nothing to change [the] . . . deference' to the district and its trained educators."  *E.S. ex rel.*

31

*B.S.*, 742 F. Supp. 2d at 436 (quoting *Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004), *aff'd*, 142 F. App'x 9, 10 (2d Cir. 2005)).

\* \* \*

The Court concludes that D.E.'s 2011-2012 and 2012-2013 IEPs were neither procedurally flawed nor substantively deficient. Therefore, the Court need not reach the issues of whether D.E.'s unilateral, private placement at Eagle Hill was appropriate or whether equitable considerations weigh in favor of tuition reimbursement. *See A.C. ex rel. M.C.*, 553 F.3d at 173.

## CONCLUSION

For the foregoing reasons, the Court concludes that the 2011-2012 and 2012-2013 IEPs were both procedurally and substantively adequate, and the services offered by the District were appropriate. Regardless of the adequacy of Eagle Hill, the District need not reimburse Plaintiffs for tuition for the 2011-2012 and 2012-2013 school years because it offered D.E. a FAPE for each year. Therefore, Plaintiffs' motion for summary judgment is DENIED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 41 and close the case.

Dated:   June 28, 2016                                            SO ORDERED:
         White Plains, New York

                                        _____
                                        NELSON S. ROMÁN
                                        United States District Judge

32